SEABOARD MACHINERY CORPORA-
TION, a Delaware corporation,
Plaintiff,

v.

BETHLEHEM STEEL COMPANY,
INCORPORATED, Defendant.

Civ. A. 425.

United States District Court
N. D. Florida, Tallahassee Division.

July 3, 1956.

See also 120 F.Supp. 591.

———◇———

Caldwell, Parker, Foster & Wigginton, Tallahassee, Fla., for plaintiff.

Claude Pepper Law Offices, Miami, Fla. (Claude Pepper, Neal Rutledge and Donald Wilkes, of counsel), Keen, O'Kelley & Spitz, Tallahassee, Fla. (A. Frank O'Kelley, of counsel), Milam, McIlvaine, Carroll & Wattles, Jacksonville, Fla. (Donald K. Carroll, of counsel), and Cravath, Swaine & Moore, New York City (Ralph L. McAfee, Allen F. Maulsby and John R. Hupper, of counsel), for defendant Bethlehem Steel Company.

Edward H. Cushman, Philadelphia, Pa., and Ausley & Ausley, Tallahassee, Fla., for defendant Peerless Casualty Company on counterclaim of Bethlehem Steel Company against Peerless Casualty Company.

DE VANE, Chief Judge.

This is a double barrel cause of action. The first four counts are based on contract and quantum meruit revolving around the contract. The last two counts sound in tort—charging conspiracies between defendant and other parties named but not sued, to bankrupt and drive plaintiff out of business. After the issues had been settled and before the case came on for trial, the Court determined, and the parties agreed, that the case could be more expeditiously handled by first submitting to the jury the issues raised by the first four counts of the complaint, to be followed immediately by the trial of the tort actions stated in the last two counts. Much of the evidence submitted in support of the first four counts was also applicable to the tort actions and by using the same jury in both phases of the case, much time was saved for every one.

The trial, which lasted three months and one day, resulted in a verdict for plaintiff on the first phase of the case and for defendant on counts five and six —the tort actions. As the judgment on the first phase will not be for the full amount of the verdict, the Court is required to account for the difference by this Memorandum-Decision.

### Background.

Prior to October 27, 1950, the United States, through the United States Maritime Administration, determined to embark upon an extended ship construction program and on the date last above mentioned entered into an agreement with defendant to complete designs and formulate specifications for a fleet of thirty new type, high speed, dry cargo vessels. It was also determined at that time to spread the construction of these vessels among six well-known shipbuilding companies, alloting to each company a contract to construct five vessels. They were all of the same design and were to be constructed under the specifications formulated and prepared by defendant. The several shipbuilding companies to whom these contracts were awarded were the following:

Bethlehem Steel Company,

Bethlehem Sparrows Point Shipyard Company,

Newport News Shipbuilding and Dry
  Dock Company,

Sun Shipbuilding and Dry Dock Company,

Ingalls Shipbuilding Corporation,

New York Shipbuilding Corporation.

Each held a contract for the construction of five ships. The contract between the Maritime Administration and each shipyard authorized subcontracting part of the work required for the construction of each ship.

### Hatch Cover Subcontracts.

The specifications called for a new type, quick opening hatch cover for all these mariner ships. And for reasons not necessary to recite here all the shipyards appeared in agreement that Seaboard Machinery Corporation, a small New Jersey corporation, controlled preferable patents applicable to quick opening hatch covers, and so it was determined by each shipbuilding company to award to said Seaboard Machinery Corporation of New Jersey separate contracts for the construction of all thirty shipsets of hatch covers. Contracts were accordingly awarded by each shipbuilding company to the Seaboard Machinery Corporation of New Jersey for the construction of five complete shipsets of hatch covers, consisting of one hundred fifteen covers per ship.

Seaboard Machinery Corporation of New Jersey was organized on May 14, 1942, by John G. Deegan, a man of considerable means who owned several small corporations used in his overall business activities. The Seaboard Machinery Corporation of New Jersey, primarily an engineering organization according to the testimony, had for some time been engaged in the process of developing and improving patents held by it that would make it possible to construct and install upon ships quick opening hatch covers. This company had since 1947 received contracts for some such hatch covers and the successful operation of these hatch covers had been brought to the attention of the defendant through their installation upon two ships, the Constitution and Independence, built by defendant just prior to the beginning of the mariner program.

Seaboard Machinery Corporation of New Jersey had very little capital and no plant and had never built a hatch cover on its own account. It had sublet every hatch cover contract it had previously secured and merely provided the patents and technical and engineering assistance required for their construction and installation. After Seaboard of New Jersey had secured its six contracts for the construction of the thirty shipsets of hatch covers, Mr. Deegan died and the corporation was thereby rendered unable to finance and carry out the contracts it held with the six shipyards for the thirty shipsets of hatch covers. An engineer by the name of Jernestrom was the technical hatch cover engineer employee of Seaboard of New Jersey and he finally succeeded in interesting others in the contracts and secured sufficient financial assistance to organize a new corporation to take over the contracts and the assets of Seaboard Machinery Corporation of New Jersey. The new corporation is plaintiff in this case.

After plaintiff had acquired the assets, patent rights and the contracts held by Seaboard of New Jersey, it decided to construct a plant of its own and enter upon the construction of hatch covers. This plant was located at Panama City, Florida, on property leased from the United States, comprising part of what is generally referred in these parts as the Wainwright Shipyard.

During the early days of its operation, plaintiff was inadequately financed for the large undertaking it had assumed. However, it was successful in persuading all shipyards to agree to advance to it "progress payments", that is, advances for construction work on its several contracts as its construction work progressed. Shortly after arrangements had been perfected for progress payments to be made to it by all shipyards, plaintiff subcontracted four of its contracts to two other companies (Williamsburg Steel Fabricators, Inc., and North-

eastern Boiler & Welding Company, Ltd.), reserving for itself the contracts with the two Bethlehem yards.

Under the new progress payment arrangements, plaintiff found itself in position to go forward with its construction program. However, as a result of the Korean War at the time these contracts were being performed, steel became very scarce and hard to get and plaintiff, along with all others involved in the construction program, suffered greatly on account of the steel shortages. The evidence in the case shows that but for the assistance of the defendant in providing it with needed steel, plaintiff would not have been able to perform in any substantial way any of the contracts with any of the shipyards. Defendant supplied plaintiff with most of the steel required for the construction of fifteen shipsets of hatch covers. None of the shipyards were under obligation to provide plaintiff with the steel required to fulfill its contract and none of the other yards aided plaintiff on this score. Two-thirds or more of the steel provided by defendant was used by plaintiff at its Panama City plant for the fulfillment of its contracts with the two Bethlehem corporations. Williamsburg Steel Fabricators, Inc., was furnished the remaining steel to be used in the construction of hatch covers it was under contract with plaintiff to deliver. Northeastern Boiler & Welding Company, Ltd., was in bad financial condition and never secured any substantial amount of steel or did any substantial amount of work on the performance of its contracts with plaintiff.

Under the provisions of the progress payment agreement, plaintiff was authorized to draw down in progress payments, as the work progressed, up to approximately 95% of the net price per shipset of hatch covers. The net price in each case was the sum of $1,053,067.50 for five shipsets of $210,613.50 per shipset. In the case of the two Bethlehem yards to whom plaintiff contended throughout the trial of this case the hatch covers produced at Panama City belonged, plaintiff drew down on account of these two

contracts substantially the full amount of the 95% authorized. As to defendant's contract, plaintiff drew on account thereof $993,584.95. On the Bethlehem Sparrows Point contract, plaintiff drew down $984,433.09. During the same period of time with little if any more than five additional shipsets of hatch covers in the process of construction by plaintiff's subcontractors, plaintiff drew down from the other shipyards the following progress payments:

| | |
|---|---|
| Newport News Shipbuilding and Dry Dock Company | $744,414.84 |
| Sun Shipbuilding and Dry Dock Company | 744,308.46 |
| Ingalls Shipbuilding Corporation | 402,196.23 |
| New York Shipbuilding Corporation | 86,257.39. |

Hatch Covers Constructed and Delivered Under the Several Contracts.

After getting itself in a financial position to do so and after the steel shortage and other difficulties had been partially overcome, plaintiff proceeded expeditiously with the construction of the ten shipsets of hatch covers called for by the two Bethlehem contracts. As heretofore pointed out, defendant furnished practically all steel used in the construction of the ten shipsets of hatch covers at the Panama City plant of plaintiff. The evidence in the case clearly shows that defendant and its affiliate Bethlehem Sparrows Point Shipyard Company claimed and asserted title to these ten shipsets of hatch covers on the ground it had furnished the steel for their construction and the two shipyards had paid for them, and plaintiff throughout the trial of this case claimed that it had at all times and did then freely and gladly acquiesce therein. However, the parties during the entire construction program were fully aware of the fact that under the law and rules and regulations controlling scarce materials then in effect, the National Production Authority had the right to say where every hatch cover produced by plaintiff at Panama City or elsewhere should be sent. Realizing this and to keep National Production Author-

ity out of the picture and to meet the demands of the other shipyards that were pressing plaintiff for the delivery of hatch covers under their contracts, defendant at least acquiesced in if it did not in fact direct plaintiff to deliver to it only three shipsets of hatch covers and to its Bethlehem Sparrows Point affiliate only two shipsets of hatch covers and distributed the remaining five shipsets of hatch covers among three of the other shipyards, Newport News Shipbuilding and Dry Dock Company and Sun Shipbuilding and Dry Dock Company getting two each and Ingalls Shipbuilding Corporation getting one.

The construction of the ten shipsets of hatch covers for the two Bethlehem yards was completed in November, 1952, and the Panama City plant practically ceased operation. Negotiations were promptly initiated by all the shipyards to induce plaintiff to return most of the work subcontracted to Williamsburg Steel Fabricators, Inc., and Northeastern Boiler and Welding Company, Ltd., to the Panama City plant, but while these negotiations were in progress, the Panama City plant was destroyed by fire on the night of December 22, 1952. The negotiations between the several shipyards and plaintiff for the return of the production to Panama City continued for some time after the fire. These negotiations were not successful and the contracts were cancelled out by all the shipyards during March and April, 1953. It was these negotiations, however, that finally led to the tort actions brought by plaintiff against defendant in counts five and six of the complaint.

Actions of the Shipyards Following the Cancellation of the Contracts.

As heretofore pointed out, Northeastern Boiler and Welding Company, Ltd., did very little towards the performance of its contracts with plaintiff. Williamsburg Steel Fabricators, Inc., also drug its feet badly and made slow progress in the performance of its two contracts with plaintiff and delivered very few hatch covers and still had considerable work to do to be in position to deliver even five full shipsets of hatch covers when all the hatch cover contracts were cancelled out by the shipyards. The evidence shows that plaintiff had paid Williamsburg Steel Fabricators, Inc., the full amount of the net contract between them for five full shipsets of hatch covers, but Williamsburg claimed (as plaintiff claimed in the first four counts of the complaint in this case against defendant) that plaintiff owed it considerable additional money for material and labor escalation, for additional fabrication, etc., and it refused to complete and deliver these hatch covers then in progress of construction until its demands were met. Plaintiff refused to meet the demands of Williamsburg, so two of the shipyards (Newport News and Sun) stepped in the breach, paid the $300,000 demanded and secured a commitment from Williamsburg to complete and deliver, and it did complete and deliver, the five shipsets of hatch covers on their orders. Under and by virtue of a pooling agreement entered into between the two Bethlehem yards, Newport News, Sun, and Ingalls, these additional shipsets of hatch covers were distributed among the yards so as to give each of the five yards referred to above three complete shipsets of hatch covers. New York Shipbuilding Corporation declined to participate in this arrangement and received no hatch covers except two miscellaneous covers delivered to it earlier in the program.

The outcome of all these complicated transactions resulted in the five shipyards receiving fifteen shipsets (three shipsets each) of hatch covers of a contract value of $3,159,202.50 at a cost to them of $4,168,937.57, all of which had been advanced by them to plaintiff on account of their several contracts except the $300,000 paid to Williamsburg to secure delivery of the five shipsets of hatch covers manufactured by it for plaintiff's account.

Defendant's Counterclaim.

It has already been noted above that defendant advanced to plaintiff on

account of progress payments $993,854.-95, which represented approximately 95% of the full net price for five shipsets of hatch covers, but that only three shipsets of hatch covers of a net value of $631,840.50 had been delivered to it by plaintiff. In its counterclaim filed in this case defendant seeks to recover from plaintiff the difference ($362,014.45) between the advances made and the contract value of the three shipsets of hatch covers delivered to it. In addition defendant seeks to recover other damages alleged to have been sustained by it, because of an alleged breach by plaintiff of its contract, in an additional amount of $675,393.05. This latter item is made up of several claims, which it is unnecessary to enumerate here. At the conclusion of all the evidence on the issues raised on the first four counts of the complaint, the Court ruled that defendant was estopped to claim a breach on the part of plaintiff for failure to deliver to it the five shipsets of hatch covers manufactured for it at Panama City, Florida, under its contract with plaintiff. The justification for this ruling is adequately supported by the evidence in this case and is further supported by the so-called pooling agreement entered into between defendant, its corporate affiliate and the other shipyards receiving the hatch covers following the cancellation of plaintiff's contracts with them.

At the time the Court held defendant was estopped to claim a breach of its contract with plaintiff, the Court held further that in determining defendant's liability to plaintiff on the verdict of the jury rendered herein that defendant is entitled to offset as a credit against said verdict the difference between the advances made by defendant to plaintiff on account of its contract with plaintiff and the full contract value of three shipsets of hatch covers actually delivered to defendant. This credit amounts to $361,-744.45.

The pooling agreement referred to above bears date of July 1, 1953, and under its provisions defendant is fully protected from any losses suffered by reason of the diversion to others of the two shipsets of hatch covers manufactured for its account by plaintiff.

■ Under the terms of the pooling agreement, each shipyard party thereto agreed to equalize their cost for the three shipsets of hatch covers delivered to each by charging each shipyard with the full net contract price for the three shipsets of hatch covers delivered, plus each shipyard's one-fifth share of the $300,000 paid to Williamsburg Steel Fabricators, Inc. This resulted in defendant drawing down out of the pool created by the agreement the sum of $158,245 on account of the overpayment made by it to plaintiff. The Court holds that in this case plaintiff is entitled to offset this amount against the excess in progress payments made to it by defendant and in determining defendant's liability to plaintiff, plaintiff will be allowed credit for this amount.

In the trial of the case it was not practicable to try the issues on the several claims asserted by plaintiff against defendant except on the basis of the terms of the full contract price. The Court therefore submitted to the jury the full amount of these claims on the assumption that five shipsets of hatch covers had been manufactured by plaintiff and delivered to defendant. In doing so, however, the Court announced that upon those items that pertained exclusively to the additional cost of production of hatch covers and directly attached thereto that defendant would be charged with only 60% of the amount of the jury's verdict. The items that fall into that class are material escalation, labor escalation, additional fabrication, and overtime and premium pay. The necessity of making these adjustments and the other adjustments enumerated above in the final judgment made this complicated and involved Memorandum-Decision necessary in this case.

### The Jury's Verdict and the Judgment of the Court.

The verdict of the jury is set out below:

"Verdict.

"Upon the several claims of the respective parties submitted to us by the Court, we, the Jury, find as follows:

"A. Upon plaintiff's several claims we find plaintiff is entitled to recover the following:

| | | |
|---|---|---|
| 1. | Material Escalation | $71,460.90 |
| 2. | Labor Escalation | 47,230.19 |
| 3. | Installation Assistance | 4,249.43 |
| 4. | Inspection Fees | 2,051.24 |
| 5. | Additional Fabrication | 110,000.00 |
| 6. | Redesign of Hatch Cover Plans and Drawings | 20,406.25 |
| 7. | Construction of a Test Cover | 12,798.12 |
| 8. | Special Tests | 1,500.00 |
| 9. | Overtime and Premium Pay | 13,096.80 |
| 10. | Interference with Production Methods | 44,251.88 |

"B. On defendant's counterclaim we find defendant is entitled to recover the following:

| | | |
|---|---|---|
| 1. | Extra freight | 28,407.21 |
| 2. | Correction of defects | 6,024.00 |

So say we all.

"Dated this 9 day of March, A. D. 1956.

"/s/ L. C. Crabtree
"L. C. Crabtree          Foreman"

Based upon the findings of the Court enumerated above, plaintiff is entitled to recover from the defendant the following:

| | |
|---|---|
| Material Escalation | $ 42,876.54 |
| Labor Escalation | 28,338.11 |
| Installation Assistance | 4,249.43 |
| Inspection Fees | 2,051.24 |
| Additional Fabrication | 66,000.00 |
| Redesign Claim | 20,406.25 |
| Test Hatch Cover | 12,798.12 |
| Special (operational) tests | 1,500.00 |
| Overtime and Premium pay | 7,858.08 |
| Interference with production Methods | 44,251.88 |
| Credit received by defendant under pooling agreement | 158,245.00 |
| Total of all | $388,574.65. |

Defendant is entitled to the following offsets:

| | |
|---|---|
| Overpayment on hatch cover account | $361,744.45 |
| Total of counter-claims | 34,431.21 |
| Total | $396,175.66 |
| Amount due defendant by plaintiff | $ 7,601.01. |

A judgment will be entered in this case in defendant's favor in conformity with the jury's verdict and the holdings and rulings of the Court in this Memorandum-Decision.

## Jury's Verdict on Counts Five and Six.

Every issue involved in counts five and six was submitted to the jury and at the conclusion of the case the jury rendered verdicts for defendant on both counts. The Court is of the firm opinion that the jury's verdicts were in all respects correct.

The Court is unwilling to conclude this Memorandum-Decision without a word of praise of the jurors that sat so patiently through the long trial of this case. They returned verdicts that were fully supported by the evidence in the case in every respect. They are to be commended for a difficult task well done.

## Final Judgment.

This case came on for trial before a jury and the jury returned verdicts on all issues submitted to it.

The Court made certain rulings of law applicable to the case during the trial thereof and has filed herein its Memorandum Decision setting forth all the issues decided by the Court and by the jury, and in conformity therewith, it is hereby

Ordered and Adjudged that defendant Bethlehem Steel Company, Incorporated do have and recover of and from Seaboard Machinery Corporation the sum of Seven Thousand Six Hundred One and 01/100 Dollars ($7,601.01) for which let execution issue. No court costs will be taxed against either party in this case.