**FARRELL MARINE DEVICES, INC.**

v.

**The UNITED STATES.**

No. 322-60.

United States Court of Claims.
April 14, 1967.

Allen Kirkpatrick, Washington, D. C., attorney of record, for plaintiff. James L. Dooley, and Cushman, Darby & Cushman, Washington, D. C., of counsel.

Joseph V. Colaianni, Washington, D. C., with whom was Asst. Atty. Gen. Barefoot Sanders, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

OPINION

PER CURIAM:

■ This case was referred to Trial Commissioner George Willi with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on December 30, 1966. On February 28, 1967, plaintiff filed a "notice of termination" stating that no exceptions to the commissioner's report or supporting brief will be filed by plaintiff and, on March 6, 1967, the defendant filed a motion that the court approve and adopt the commissioner's findings of fact and recommended conclusions of law. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Plaintiff is therefore not entitled to recover and the petition is dismissed.

OPINION OF COMMISSIONER *

WILLI, Commissioner: This is a patent suit under 28 U.S.C. § 1498, in which plaintiff seeks reasonable and entire compensation [1] for the United States' unauthorized use of a patented invention. Plaintiff alleges infringement of claim 2 of U. S. Patent No. 2,707,928, entitled "Ship's Hatch And Cover," which issued

---

* The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

1. The parties have agreed, as authorized by Rule 47(c) (1), that present consid-

eration should be limited to the issue of plaintiff's right to recover, with determination of the amount of recovery, if any, reserved for further proceedings.

to Valdemar C. Farrell, plaintiff's president and controlling shareholder, on May 10, 1955. The application had been filed by him on January 9, 1951. Plaintiff, a Delaware corporation, acquired full ownership of the patent in suit by a valid assignment from Valdemar Farrell made more than six years before institution of the present suit.

Applying controlling legal principles to the facts of this case, as detailed in the findings of fact accompanying this opinion, it is concluded that plaintiff is not entitled to recover. The claim in suit is invalid if accorded the breadth necessary to encompass either type of construction accused herein. If, on the other hand, the claim sued on is ascribed the more limited meaning essential to its validity in the light of relevant prior art, the accused constructions do not infringe.

### Structural Evolution of Ships' Hatch Covers

An important aspect of the profitable operation of a cargo-carrying merchant ship is the minimization of time spent in port for loading and unloading, during which period no revenue is produced. Accordingly, the merchant shipping community has long been interested in means and methods of facilitating and expediting the performance of these functions. One facet of the problem to which considerable attention has been devoted is the matter of efficiency in the removal of the covers used to seal the hatch openings on the top, or so-called weather deck and on the interior or 'tween decks. This action is concerned only with the hatch covers used on the weather decks of certain dry cargo ships owned by or built for the Government.

Various maritime regulations have long required that all weather deck hatches be equipped with a raised steel coaming. A coaming is simply an upright rim, customarily extending nine inches above the surrounding deck surface, that forms a border around the entire hatch opening which is usually rectangular in form, running from fore to aft.

Prior to World War II the type of weather deck hatch cover in general usage consisted of a series of wooden beams spanning the hatch openings and seated in sockets provided on the inside of the coaming. Wooden planks were then laid across the beams and finally a canvas tarpaulin was stretched over the solid surface provided by the planks and made snug by a collar fitted over the outside of the coaming. Both the placement and removal of this type cover were extremely time-and-labor-consuming operations. Moreover, experience in the war demonstrated that ships so equipped were extremely vulnerable to torpedo damage.

Though United States and foreign patents had been periodically issued from the early 1900's for sectional steel hatch covers that were removable by various means, it was not until the era of new-ship construction following World War II that watertight weather deck covers of that general type became extensively employed.

Although differing in the means and methods for removal from the hatch opening, the new-type covers were all of the same basic configuration. The cover sections were fashioned in the manner of a series of steel bulkheads of sufficient width to span the hatch opening to be covered. On the underside of the outboard edges of the several sections, the number of sections depending upon the length of the hatch involved, was affixed a resilient gasket material that seated on the ridge or uppermost edge of the upright coaming bounding the perimeter of the hatch opening. A watertight seal was then obtained by manually bolting the outside edges of the cover sections to the coaming. This process is referred to as dogging.

Removal of the cover sections for cargo loading or unloading was typically achieved by a wheel and track arrangement. The track consisted of a horizontal ledge mounted on the upper portion of each of the two outboard sides of the coaming. These ledges ran the entire length of the hatch and parallel to both the deck surface and the ridge of

the coaming. The cover sections were fitted with wheels mounted in a fixed downward position on the sections' outboard sides so as to rest on the coaming ledge and support the underside of the sections somewhat above the coaming ridge. In this position the cover sections, hinged together at their intermediate points of joinder across the hatchway, with the outside edge of one end section hinged to the coaming at the end of the hatch (the opposite end section being free), could be rolled clear of the hatch opening and folded together in an unright position at one end of the hatch. The pulling force required for this operation was supplied by the ship's cargo tackle and winches. If the length of the hatchway was such that more than three sections were required to cover it, the section located at each end of the hatch was hinged to the coaming so that half of the sections could be folded clear at one end of the hatch and the remaining half at the other. The free ends of the two groups of hinged sections met across the center of the hatchway.

With the cover sections extended in a horizontal plane over the hatch opening, their respective supporting wheels resting on the coaming ledges held the underside of the sections ajar of the coaming ridge, as previously noted. To permit the sections to descend until resting on the coaming ridge, a slot or opening was provided in the coaming ledges at a point directly under the position occupied by each cover wheel when the sections were fully extended in horizontal position. The number of cover wheels, and corresponding ledge openings, varied with the number of cover sections employed. In any event, the conventional method of supporting, lowering and elevating the cover wheels at the ledge-opening points involved the placement of a manually operated screw jack or similar mechanism, either mounted to the side of the coaming or upright on the deck surface, directly below each of the ledge openings.

Arrangements of the type described above were in relatively wide usage and well known to Valdemar Farrell when, in late 1948 or early 1949, he first turned his attentions to the development of mechanical means by which the *manual* dogging down of sectionalized steel hatch covers and the *manual* raising and lowering, called jacking, of individual cover wheels or sets of cover wheels could be altogether eliminated.

### The Patent and Claim in Issue

The Farrell patent, applied for January 9, 1951 and issued May 10, 1955 after extensive prosecution before the Patent Office, contains a total of five claims, with only claim 2 [2] involved in this suit.

Claim 2, construed in the light of the specification, as it must be,[3] discloses a rectangular hatch bounded by a coaming (which the drawings depict as recessed into the deck rather than extending above

---

2. Claim 2 reads:
  A hatch and covering construction comprising a hatch coaming defining a rectangular hatch opening, a ledge on at least two opposite sides of said hatch coaming and having spaced openings therein, a hatch cover seat around said coaming, a hatch cover for removable mounting on said seat and closing said hatch opening, a plurality of mobile supports spaced on said hatch cover and corresponding to the openings in said ledge, said supports resting on said ledge for movement of said hatch cover to and from closed position, said supports passing down through said openings to lower said cover on said seat, a unitary elevator means along said hatch coaming beneath said ledge and engageable with said

mobile supports when the latter extend through said openings for simultaneously lifting or lowering said supports and unseating or seating said cover preparatory to removing or closing said cover.

3. In relevant part, 35 U.S.C. § 112 provides as follows:
  *Specification*
      \*      \*      \*      \*      \*

  An element in a claim for a combination may be expressed as a means or step for performing a specifed function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

it). A slotted ledge is mounted on at least two opposite sides of the coaming to receive the wheels attached to the outboard sides of the several cover sections that come to rest on the ridge of the coaming when the supporting wheels descend through the slots provided in the coaming ledges. Those features of the claim disclose nothing new and the plaintiff does not contend otherwise.

It is the ensuing language of the claim referring to a "unitary elevator means," located along the coaming and beneath the ledge, by which the cover wheels are "simultaneously" lifted or lowered through the slots in the ledge that describes the novelty of the alleged invention.

Notably, the claim itself in no way defines the "means" referred to. Examination of the accompanying specification discloses, however, that the "unitary elevator means" for jacking, raising or lowering, the cover wheels to seat or unseat the cover sections on the coaming ridge consists of four I beams placed alongside the four sides of the hatch coaming and interconnected at three of the four corners by cables or chains. At the fourth corner a cable or chain is connected to the end of each of the two I beams converging there and the free ends of these cables or chains are run to a nearby winch. An I-beam belt around the outside base of the coaming is thus formed. This belt-like assembly is referred to in the specification as a "unitary elevator member." The belt may be rotated in either direction about the coaming by running the winch in either forward or reverse. A cam-like ramp with a flat platform surface at the top is mounted on top of the I beams at every point on the beams that is directly under a slot in the two or more coaming ledges around the hatch. The height of the ramps is such that the platform surfaces just clear the underside of the coaming ledges and they are located so that each ramp is in the same position relative to the wheel-opening slot above it. When

the I-beam belt is positioned so that the platforms atop the ramps are centered under the coaming ledge slots and the hinged cover sections extended in a horizontal attitude over the hatchway, the cover wheels are supported from below by the platform surfaces. In this attitude the undersides of the several cover sections are suspended above and clear of the coaming ridge. When the belt is rotated, the cover wheels descend the ramps until the weight of the cover sections is borne by the coaming ridge. In this position the cover is ready for final closing. As previously noted, this closure is conventionally effected by manually bolting the periphery of the cover to the coaming. The Farrell patent, however, proposes to dispense with the necessity for this separate time-and-labor-consuming operation by combining an automatic locking feature with the elevating and lowering function of the platform ramps. Ostensibly, this is done by mounting a horizontal pin on the square end of each platform surface, i. e., the end opposite the inclined ramp. Each of these pins is to be engaged by a keeper element mounted on the cover sections and extending downward through a small separate hole adjacent to each wheel-opening slot in the coaming ledge. When the I-beam belt is rotated in the direction causing the cover wheels to climb the inclined surfaces of the ramps, the pins are withdrawn from the keeper elements mounted to the cover. After the belt is rotated sufficiently in the opposite direction to lower the cover wheels down and clear of the ramps, a slight further rotation causes the horizontal pins to engage the hatch cover keeper elements.

Although the locking feature is not included in the claim in suit,[4] it is a relevant factor in interpreting the claim because the "unitary elevator means" relied on as the touchstone of the claimed invention is a dual-purpose apparatus intrinsically concerned as much with the locking function as it is with that of elevating and lowering the cover sec-

---

4. It is covered by claim 3 of the Farrell patent.

tions. The extent to which the design and structure of the specified "means" are governed by locking rather than elevating objectives is noteworthy when the question is that of determining the equivalence of the apparatus to other devices designed and employed for the sole purpose of moving a cover to and from its seat on the coaming ridge. The Farrell cover was never built, even on a pilot-model basis.

### The Accused Constructions

After the Victory Ship era of World War II, there was little activity in the construction of cargo vessels in domestic shipyards until the onset of the Korean hostilities demonstrated the need for a more modern and efficient merchant fleet. The U. S. Maritime Administration initiated a program of design and construction directed to the development of a vessel suitable for charter to private operators during peacetime while also readily adaptable to use as a cargo-carrying naval auxiliary in time of war.

In April 1950, the Maritime Administration completed its preliminary design work and in October of the same year awarded the Shipbuilding Division of the Bethlehem Steel Corporation a contract for the preparation of bidding plans and specifications for what was to become known as the Mariner-type ship. After receipt of this award, Bethlehem solicited hatch cover design and price proposals from various potential suppliers, including the Seaboard Machinery Corporation, a design and engineering concern without manufacturing facilities that had furnished many hatch cover installations by subcontracting the construction work. At the time, Seaboard had recently supplied the covers for a number of ships, including the U. S. passenger liners Constitution and Independence, both built in Bethlehem yards. The weather deck covers for all of these jobs were of the same general configuration, employing a raised coaming with a slotted ledge and wheel-mounted, hinged cover sections. The

largest of the hatch openings required a four-section cover whereas the 40-foot main hatches on the weather deck of the Mariners required a six-section cover. The Seaboard four-section cover was built in two parts, each consisting of two sections hinged together, hinged to the coaming at each end of the hatch. The free ends of the two parts met at the half-way point of the hatch opening. A wheel was mounted on each outboard side of the free ends of the center cover sections. These wheels were mounted in offset position so that when the sections were extended in a horizontal plane preparatory to final closing, they came full abreast of each other at the midpoint of the coaming ledge. Two parallel slots were provided in the ledge to receive the wheels so that the cover could be lowered to its seated position on the ridge of the coaming. A platform arm, hinged at one end to the underside of the coaming ledge, was provided under each pair of ledge openings. Each of the arms was supported from the underside by a manually operated screw-type jack. In all instances, the covers were fastened down by a series of individual bolts or dogs located around the periphery of the cover.

In response to Bethlehem's bidding solicitations, Seaboard initially proposed to supply covers of the same design, including provision for jacking, as those described above even though certain of the Mariner covers were oversize and therefore consisted of six sections rather than the usual four. Thus, according to the Seaboard proposals, the jacking function was to be achieved by the use of manually operated screw jacks.

It was during the time that Seaboard was formulating its design proposals for Bethlehem that Valdemar Farrell completed work on his application for the patent in suit and filed the application with the Patent Office. He thereupon promptly contacted the Maritime Administration in Washington in an attempt to promote the use on the Mariners of his hatch covers as well as other marine cargo-handling gear that

he had earlier patented and perfected. As to the hatch covers, Maritime referred him to Seaboard as the likely supplier for the Mariner program. He was acquainted with the firm because of earlier business dealings with it. In late January 1951, he contacted Seaboard and disclosed the subject matter of his patent application. In addition, he produced and left with the Seaboard representatives, for consideration and review, a preliminary blueprint drawing showing a general outline of the essential features of his hatch cover, including the means for jacking and locking it. Within a week of this disclosure, Seaboard notified Farrell it was not interested in his design.

On February 7, 1951, at about the time of Seaboard's rejection of the Farrell design, Bethlehem and four other domestic shipbuilders were each awarded Maritime Administration contracts for the construction of five Mariners. In March 1951, Seaboard was awarded subcontracts by the shipbuilders to furnish the hatch covers for all of the Mariners.

The weather deck covers ultimately furnished by Seaboard for 12 of the Mariners comprise one of the two categories of accused constructions involved in this case. The earliest Seaboard engineering drawings depicting the configuration of the jacking system used with those covers were completed in the period January-April 1952. The jacking apparatus was the first of its type that Seaboard had used and was essentially different from the individual screw-jack arrangement proposed in its 1950 and 1951 bidding submissions to Bethlehem. The changeover in jacking design occurred well after Seaboard's discussions with Valdemar Farrell, as previousy described.

The covers actually supplied by Seaboard, consisting of six sections for the main hatches and a lesser number for the smaller ones, are similar in all respects, other than jacking mechanism, to those previously sold by it and initially proposed to Bethlehem. Instead of only four cover wheels meeting at the center of the hatch at two jacking points, however, the oversize Mariner covers have four additional supporting wheels on each outboard side of the hatch. Other than that, the actual cover sections are conventionally equipped. Thus, the underside of the sections is fitted with a resilient gasket that seats on the steel coaming ridge when the cover is in its closed position. The cover is fastened down by the traditional method of manually bolting the sections to the coaming.

The apparatus for jacking the cover from its seated position, which according to the plaintiff is its infringing feature, consists of a series of steel plates cut to the same dimensions in the shape of a right triangle. Each plate serves as a supporting platform for a cover wheel. To do this, a plate is hinged at its right-angle corner to the underside of the coaming ledge at a point adjacent to a wheel-opening slot. Thus attached, the face of the plate is in a position perpendicular to the deck and parallel to the coaming with its uppermost edge serving as a wheel platform. The several plates on each outboard side of the hatch are interconnected by a horizontal bar to which each plate is attached by a pivot pin at its lower corner. With this arrangement, a back-and-forth lateral movement of the bar causes the platform surfaces of the plates to rise and fall beneath the wheel-opening slots. The force required to move the bar and thereby elevate the wheel-bearing platform surfaces to the plane of the coaming ledge is supplied by a cargo winch. Near one end of the hatch the horizontal linkage bar is attached to a lever arm by a pivot pin. In turn, the arm is attached by a pivot pin through one of its ends to the underside of the coaming ledge. A short length of cable is attached to the free end of the arm and thence threaded through a deck-mounted pulley and up through an opening provided in the coaming ledge. The free end of the cable, which extends above and clear of the ledge about two feet when the cover is in a closed posi-

tion, is fashioned into a loop which receives a cargo hook for pulling. When sufficient tension is exerted on this cable, the lever arm pivots about the pin attaching it to the underside of the coaming ledge and causes a lateral movement of the linkage bar which, in turn, causes the platform surfaces of the triangular plates to rise until they come up flush with the underside of the coaming ledge. This position is maintained by the manual insertion of a toggle pin through a hole provided in the linkage bar and into a similar hole in a fixed bracket plate mounted on the coaming. After the toggle pin is thus secured, the cargo hook is disengaged from the pulling wire, and, after the same operation is repeated on each outboard side of the hatch, the hinged cover sections are supported clear of the coaming ridge by their attached wheels and may be folded into an upright stowed position at each end of the hatch while the loading or unloading of cargo is in process.

This jacking apparatus is exactly duplicated on each outboard side of the hatch and the two identical sets of gear are in no way physically interconnected as a part of the overall hatch or cover structure. Moreover, the evidence shows that in practice the sets of gear were operated independently of each other.

The second type of accused construction involved in this case is a hinged, sectional cover installed on various U. S. Navy cargo ships by the Piezo Manufacturing Co. and the Greer Marine Corp. It is agreed that the structures furnished by each of these two firms are identical for purposes of this suit.

The Piezo and Greer covers differ relevantly from the covers supplied by Seaboard for the Mariners only in the method provided for jacking. Instead of Seaboard's mechanical linkage system, Piezo and Greer use ram-type hydraulic cylinders to raise or lower the cover wheels at the wheel-opening points in the coaming ledge.

The main weather deck hatches on the Navy ships are smaller than those on the Mariners so that only a four-section cover was required. Accordingly, the covers were built to part at the center of the hatch with two hinged sections, supported by two cover wheels at their free ends, folding toward each end of hatch for upright stowage. As in the case of the cover used by Seaboard on the Constitution and Independence, the two wheels on each side of the hatch are mounted on the center cover sections in an offset position so that, when the cover was in a closed position, they come abreast of each other on the coaming ledge where a slot is provided for each. Because of this arrangement, both wheels can be supported by a single platform arm pivot-mounted on the underside of the coaming ledge. This arm is actuated from its underside by an upright hydraulic ram fastened to the deck underneath the coaming ledge. The two rams, one on each side of the hatch, are incorporated in a single hydraulic system so that by operation of a single control switch or valve they move up or down in unison. Both the Piezo and Greer covers rely on the traditional bolt or dog system for final closure and sealing.

### Validity

#### A. The Prior Art

During prosecution of the Farrell patent, the Patent Office cited eighteen United States patents and nine foreign patents as indicating the state of the art.

In challenging the validity of claim 2, the defendant relies on twelve United States patents, three of which were cited by the Patent Office,[5] and three British

5. Griffin '958 discloses a circular watertight submarine hatch, the entire perimeter of which is simultaneously raised by the interaction of mated cam-faced projections affixed to the hatch and to the surrounding hull. When the cover is rotated from within the submarine (preparatory to final opening), the shoulders of the cam surfaces cause a vertical movement breaking the cover seal. This

patents, one of which was cited by the Patent Office.[6]

For validity purposes it is only necessary to consider three of the domestic patents urged by the defendant: Griffin '958, McGray '456 and '946,[7] and Marinello '631.[8]

Griffin '958 discloses the functional attribute of the unitary unseating of a circular, one-piece, submarine hatch

initial vertical movement is the equivalent of jacking in the case of a watertight hatch cover on a cargo ship.

McGray '767, allegedly an improvement over McGray '456 and McGray '946 (finding 57, supra), discloses an essentially flush, watertight hatch cover consisting of a series of sections independent of each other. Each section has two wheels, one mounted at the center of each outboard side. These wheels run on an angle iron channel bolted to the deck at the base of the recessed coaming and extending well past each end of the hatch. By rolling to the portions of the channel extending past the ends of the hatch, the cover sections may be moved clear of the hatch opening. A half-moon well is recessed into the deck at each point along the channel where a cover wheel will rest when all of the cover sections are positioned over the hatch opening preparatory to closing. A sliding member is provided adjacent to each recess well so that the well may be either exposed or covered over at the level of the angle iron channel. When the sections are rolled to their position for closing, a manually operated lever is employed to individually raise each cover wheel so that the sliding member may be pulled aside and the wheel lowered into the exposed half-moon recess until the weight of the cover section is borne by the ridge of the recessed coaming. When this is done with all wheels on all sections, the sections are bolted together where they join across the hatch opening and bolted down around the full periphery of the opening. Basically this patent differs with the prior Mc-Gray patents only in that it is adapted to an essentially flush-type coaming rather than to the traditional raised coaming.

6. Donald '429.

7. 57. McGray '456 and '946, the latter issued as an improvement patent over the former, disclose a watertight sectional hatch cover system that is removable by a rolling away of each of the wheel-mounted sections on a slotted ledge mounted on the outboard sides of the coaming. The fore-to-aft width of each cover section is slightly less than twice the height of the coaming above deck level. A wheel is mounted at the center point of each outboard side of every section. A continuous ledge is provided extending throughout and beyond the entire length of the outboard sides of the upright hatch coaming. This ledge is mounted sufficiently high on the sides of the coaming that when the cover section wheels are riding on it, the underside of the sections will be raised above the top of the coaming ridge. Thus, the sections may roll laterally across the length of the hatch opening and after clearing the end of the opening may continue onto the ledge extensions at which point they may be tilted upright and aggregated for stowage while loading or unloading is in process. To close the hatch, the sections are returned to the horizontal and rolled back on the ledge until the entire length of the hatch opening is covered by sections resting ajar of the coaming ridge. To lower the sections onto a seated position on the coaming ridge, slots in the coaming ledge are provided directly under each cover section wheel station. Immediately below each ledge slot, a vertical screw jack is bracket-mounted to the side of the coaming. When these jacks are turned down, the cover wheels are permitted to descend into the slots in the ledge until the outboard sides of the cover sections come to rest on the coaming ridge. At that point final closure and sealing of the cover is effected by bolting or dogging each section down to the coaming. The jack provided under each slot in the coaming ledge is actuated manually and functions independently of all others.

8. 59. Marinello '630 and '631, which were co-pending in the Patent Office and issued the same date, deal with the means and methods by which a section of the roof of a sealed truck body may be removed in order to provide additional headroom for the loading and carriage of oversized cargo not requiring a sealed enclosure during transit. Though not referred to as such by the inventor, the structure is quite similar in principle and configuration to a hatch cover construction or a cargo ship.

Marinello's object is to provide an opening in the roof of a sealed truck body by constructing the roof with a removable cross-section located at the front, center or rear of the body, wherever desired. This removable section is the equivalent of a section on a ship's hatch cover. The sides of the body are the

cover. The entire perimeter is simultaneously raised from its seat on a sealing gasket by the interaction of mated cam-faced projections located around the edge of the hatch cover and on the surrounding hull. When the cover is rotated from within the submarine, preparatory to final opening, the shoulders of the cam surfaces cause a vertical movement of the cover thereby breaking the seal.

McGray '456 and '946, issued in 1909 and 1915, respectively, teach the use of removable, sectional hatch covers supported by wheels resting on coaming ledges on each side of the hatch opening. Moreover, the ledges are slotted at appropriate points to receive the wheels, in order that the cover sections may be lowered to a seated position in the coaming ridge. Below each slot in the ledge a screw-type jack is mounted in an upright position on the side of the coaming. These jacks serve as the supporting and elevating means for the cover wheels.

Marinello '631 is a more modern adaptation of the McGray principles to a removable cross-section of the roof of a sealed truck body. The removable section is the practical equivalent of a hatch cover section. The sides of the body are as the outboard sides of a hatch coaming. A horizontal ledge is mounted near the top of the body sides.

The movable roof section has wheels mounted on each of its outboard sides. Slots are provided in the ledges at each point occupied by a wheel when the movable section is positioned directly over the roof opening. A vertical jack screw, bracket-mounted to the side of the body, is located directly below each ledge slot. A horizontal shaft and worm gear arrangement is mounted on each side of the truck body below the slotted ledge and simultaneously actuates all jack screws on each side of the body to raise or lower one side of the movable section off of or onto its seated and sealed position over the roof opening. The two side-mounted shafts that actuate the jack screws are not physically interconnected. Marinello calls for them to be operated either with a hand crank or by supplementary power such as an electric motor. Given the motors to power the shafts individually, it would be an obvious mechanical expedient to synchronize the two motors so that the shafts would operate in unison.

### B. *The Prosecution History*

Plaintiff's contention that the claim in suit should be ascribed a meaning as broad as the literal purport of its language will not withstand analysis.

■ A fundamental principle of claim construction is that a claim should be interpreted in the light of its file wrapper or prosecution history in the Patent Office. Graham v. John Deere Co., 383

equivalent of the outboard sides of a hatch coaming. A ledge is provided along the upper portion of the body sides. The movable portion of the roof has wheels mounted on its outboard sides. Slots are provided in the ledge directly below the roof section's wheel locations when the section is centered directly over the roof opening. A vertical jack screw, bracket-mounted to the side of the body, is located directly below each slot in the ledge. A horizontal shaft and worm gear arrangement on each side of the truck body underneath the ledge, actuates all jack screws on one side of the body simultaneously. The jackscrew's function is to permit the movable section's wheels to descend into the ledge openings and there-

by permit the section to assume a seated and sealed position over the roof opening or to raise the wheels up to the level of the top surface of the ledge so that the section may be rolled clear of the roof opening and over the portion of fixed roofing adjoining the opening at either end. The two side-mounted shafts that actuate the jack screws are not physically interconnected. The patentee speaks of these shafts as being operated either with a hand crank or by supplementary power such as an electric motor. Given the motors to power the shafts individually, it would be a mechanical expedient to synchronize the motors so that the shafts would be actuated simultaneously.

U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Reference to such history, detailed in findings 42–53,[9] is illuminating in the present case.

9. 42. The Farrell patent application, as originally filed on January 9, 1951, contained 14 claims. Neither the phrase "unitary elevator means" nor any specific reference to a "simultaneous" lifting or lowering of hatch cover wheels appeared in the original claims or specification. The "means" for jacking the cover was referred to for claim purposes only in terms of an enumeration of component parts illustrated in the drawings and described in the specification. Thus, claim 5 referred to "mobile mounts" depending from the hatch cover, a "ledge having openings for the passage of said mounts," and a "belt-like support includ[ing] a plurality of spaced ramp-like runways for supporting said mounts and moving said cover vertically to accommodate said sealing rib and channel."

43. In an action of November 5, 1951, the examiner rejected substantially all of the claims, including claim 5, as "indefinite."

44. By an amendment to the application, filed May 6, 1952, various language changes were made as to several of the claims. No changes were proposed as to claim 5, however. The amendment's only specific reference to claim 5 was an observation made in narrative form to effect that certain prior art did not preclude patentability in the reference to "mobile mounts and ramps set forth in claim 5."

45. On October 15, 1952, Farrell filed a supplement to the amendment of May 5, 1952, adding a claim 15 to the application, as follows:

15. A hatch and cover construction, comprising a hatch coaming defining a rectangular hatch opening, a ledge around the hatch coaming and having spaced openings therein, a hatch cover seat around said coaming, a hatch cover for removable mounting on said seat and closing said hatch opening, a plurality of mobile supports spaced around said hatch cover and corresponding to the openings in said ledge, said supports being mounted on said ledge for movement of said hatch cover to and from seated position, and passing down through said openings to mount said cover on said seat, and unitary elevator means around said hatch coaming beneath said ledge for simultaneously lifting said supports up through said openings and unseating said cover preparatory to removing said cover.

It was by this supplemental amendment that the phrase "unitary elevator means" and reference to "simultaneously" lifting or lowering the cover wheels were first included in the application.

46. On November 12, 1952, Farrell filed a further amendment effecting certain insubstantial language changes in the newly added claim 15.

47. By an action of January 16, 1953, the examiner rejected claim 15 as unpatentable over certain prior art and as indefinite. In amplification of the matter of indefiniteness the examiner stated: "It is not clear what structure is referred to by 'mobile supports', line 5. It is further not clear what 'unitary elevator means' are thereby described." The file wrapper does not reflect any direct response to the latter inquiry by the applicant.

48. On July 20, 1953, Farrell filed a further amendment to his application in which no specific reference to claim 15 was made.

49. In an action of February 19, 1954, the examiner rejected claim 15 with the following explanation:

Claim 15 is rejected as unpatentable over McGray ['767] taken with either Griffin ['958] or Donald ['429–British]. To provide an elevator means along the hatch coaming of McGray would be a matter of choice since it is old to use an elevator for a like function as shown by each of the latter references. No new or unexpected result would be had by so doing.

50. By an amendment of August 23, 1954, Farrell canceled claim 15 and added the following new claim 16:

A hatch and covering construction comprising a hatch coaming defining a rectangular hatch opening, a ledge on at least two opposite sides of said hatch coaming and having spaced openings therein, a hatch cover seat around said coaming, a hatch cover for removable mounting on said seat and closing said hatch opening, a plurality of mobile supports spaced on said hatch cover and corresponding to the openings in said ledge, said supports resting on said ledge for movement of said hatch cover to and from closed position, said supports passing down through said openings to lower said cover on said seat, a unitary elevator means along said hatch coaming beneath said ledge and engageable with said mobile supports when the latter extend through said openings for simultaneously lifting or lowering said supports and unseating or

Significantly, none of the 14 claims in the original application specified a simultaneous lifting of all cover sections off their seated position on the coaming

seating said cover preparatory to removing or closing said cover.

In the narrative portion of the amendment Farrell explained his newly added claim 16 as follows:

Applicant thanks the Examiner for the courteous interview accorded himself and counsel.

In accordance with the agreement reached during the interview claim 15 is rewritten as claim 16 so as to properly distinguish over the references of record.

\* \* \* \* \*

Claim 15 was rejected on McGray taken with Griffin or Donald, but during the aforementioned interview it was agreed that when revised as now submitted as claim 16 the claim would be properly allowed over these references. The claim defines a ledge around the hatch coaming and having spaced openings therein, a hatch cover seat around the coaming and a plurality of mobile supports spaced on the hatch cover and passing through the openings in the ledge when the cover rests on the seat, and unitary elevator means beneath the ledge and engageable with the mobile supports when the latter extend through the openings in the ledge for simultaneously lifting or lowering the supports and unseating or seating the cover. McGray discloses a cover having mobile supports on each side with sockets within the deck to receive the wheels of the supports. McGray fails to suggest a ledge with openings therein and unitary elevator means beneath the ledge and engageable with the supports when they extend through the openings. McGray removes the wheels from the sockets by a hand lever, each wheel being individually liifted by this lever. Thus, McGray clearly fails to suggest the basic concept of the present invention.

McGray likewise fails to provide any basis for a combination with the teachings of the secondary references to Donald and/or Griffin, and which will approach the structure set out in the claim. The British patent to Donald does not disclose mobile supports and is concerned solely with the latching of the cover. As this reference is a foreign disclosure it is necessarily limited to its exact disclosure and consequently completely fails with respect to the present claim. *Griffin does show friction cam means for slightly lifting a cover to break the seal between the cover and the seat;* however, *he does not suggest the specific structure set out in the claim* nor can this disclosure be combined with McGray to meet the claim. To modify McGray in accordance with Griffin, Griffin's cams would be disposed on the under side of the cover for cooperation with latching means around the hatch opening for retaining the cover in position. This combined structure is a far cry from the definition of the claim. Accordingly, it is submitted that claim 16 is now in condition for allowance. (Emphasis added.)

51. By an action dated September 3, 1954, the examiner notified the applicant that claim 16 was allowable. This claim became claim 2 of the Farrell patent as later issued.

52. Claims 3 and 4 of the patent in suit read as follows:

3. A hatch and cover construction comprising a hatch coaming defining a rectangular hatch opening, a ledge extending around said coaming and having spaced openings therein, a hatch cover fitting said hatch coaming and having down-turned edge flanges resting on said ledge when said cover is in closed position, apertured lugs fixed to said cover and extending below said cover flanges for passage through said ledge openings when said cover is in closed position, and unitary locking means including a belt-like member mounted beneath said ledge and carrying a plurality of pins for respective insertion in the apertures in said lugs to lock said cover in closed position.

4. A hatch and cover construction as defined in claim 3 wherein said cover is provided with a plurality of depending mobile supports, said ledge having a second series of spaced openings for the passage of said supports, and said belt-like member including a plurality of space[d] ramp-like runways for supporting said supports and moving said cover vertically to lift said cover from and seat it on said ledge.

53. Although the complete phrase "unitary elevator means" appearing in claim 2 of the patent in suit is nowhere contained in the specification and is therefore not expressly defined therein, the word "unitary" and its intended connotation are set forth in the following passage from the specification (Column 3, lines 30–44):

When the hatch cover is closed, the said wheels 10 or supports 11 and lugs

rib. This particular characteristic or capability, now said to constitute the essential novelty of the claimed invention, was introduced by a new claim, numbered 15, added in October 1952, more than 21 months after the original application was filed. Parenthetically, it is noted that the addition of this claim closely coincided with the launching of the first of the Mariner ships. In any event, on February 19, 1954, the examiner rejected claim 15 with the following explanation: "Claim 15 is rejected as unpatentable over McGray ['767] taken with either Griffin ['958] or Donald ['429—British]. To provide an elevator means along the hatch coaming of McGray would be a matter of choice since it is old to use an elevator for a like function as shown by each of the latter references. No new or unexpected result would be had by so doing."

On August 23, 1954, after an interview with the examiner, the applicant canceled claim 15 and replaced it by a new claim 16 embodying the language contained in claim 2 as ultimately allowed. The applicant accompanied the newly filed claim 16 with a narrative statement setting forth the reasons supporting its allowance. After noting that claim 15 had been disallowed in part on the basis of Griffin (the submarine hatch cover patent previously described), the applicant offered the following explanation in rebuttal: "Griffin does show friction cam means for slightly lifting a cover to break the seal between the cover and the seat; however, he does not suggest the specific structure set out in the claim * * *."

Thus, it is seen that the patentee elected to surmount the prior art obstacle of Griffin on structural rather than functional dissimilarities. He did not attempt to distinguish Griffin in terms of any difference between the result that it produced and that of his claimed invention. Candidly conceding that Griffin taught the simultaneous raising of an entire hatch cover from its seat, he denied that his invention was anticipated because of the unique structural means by which he achieved the same result.

■ The structural qualifications relied on by the applicant to secure allowance of a claim by the Patent Office cannot be thereafter disregarded as irrelevant.

C. *Scope of the Claim*

Reference to the specification strongly supports the interpretation of the claim language indicated by the prosecution history.

To support the broad, literal interpretation for which it now contends, plaintiff accounts for too little of the language of its claim when it describes the alleged invention in terms of a capacity " * * * for simultaneously lifting or lowering said supports and unseating or seating said cover preparatory to removing or closing said cover."

The complete passage that includes the words selected by plaintiff reads as follows: " * * * a *unitary elevator means* along said hatch coaming beneath said ledge and engageable with said mobile supports when the latter extend through said openings *for simultaneously lifting or lowering said supports and unseating or seating said cover* preparatory to removing or closing said cover." (Emphasis added.)

13 will be invertical alignment with slots or openings 16—16' respectively in a plate 17 forming a ledge or angle on which the hatch cover bears when closed. Beneath this plate and in parallel relation thereto, I beams 18 are movably mounted on brackets 19 supporting anti-friction bearings 20. An I beam 18 is fitted at each side and each end of the hatch and *their ends are joined together* by flexible members 21, such as cables or chains, *so that they form a continuous belt-like unitary elevator and locking member* around the hatch coaming 7. *This continuous unitary member* is preferably enclosed by an apron or auxiliary coaming 22 depending from the plate 17 and around the brackets 19 and thereby define the actual hatch opening. (Emphasis added.)

It is seen that the claim specifies that the result described by the language relied on by plaintiff is to be achieved by a "unitary elevator means" but it does not define that "means" in terms of structure, material or otherwise. 35 U.S.C. § 112 directs that such a claim " * * * shall be construed to cover the corresponding structure, material or acts described in the specification and equivalents thereof." Resort to the specification as a constructional aid in the present case is further commended by the fact that a claim in suit is a part of a so-called "paper patent" [10] in a crowded field. Jones v. United States, 100 F. Supp. 628, 658–659, 120 Ct.Cl. 747, 799–800 (1951).

Though it does not contain the exact phrase "unitary elevator means," the specification clearly defines this element of the claim. It provides: "An I beam is fitted at each side and each end of the hatch and their ends are joined together by flexible members, such as cables or chains, so that they form a continuous belt-like unitary elevator and locking member around the hatch coaming."

Accordingly, the disclosure of claim 2, to which presumptive validity [11] properly attaches, must be limited in scope to a hatch cover having those structural components that are enumerated in the claim plus the capacity for simultaneous raising or lowering *by an apparatus consisting of four interconnected I beams around the hatch coaming or the equivalent thereof.* This is, therefore, the standard against which the accused constructions must be measured for infringement purposes.

### Infringement

■ The problem of determining the equivalence of the accused constructions to the patented invention must be approached in the light of the long-established principle that where, as in this case, the art is crowded, the range of equivalents to be accorded the claimed invention is narrow. Soundscriber Corp. v. United States, 360 F.2d 954, 175 Ct. Cl. 644 (1966); Trusty v. United States, 132 F.Supp. 340, 344, 132 Ct.Cl. 192, 199–201 (1955), cert. den. 350 U.S. 975, 76 S.Ct. 453, 100 L.Ed. 846 (1956); Richardson v. United States, 72 Ct.Cl. 51, 65 (1931), cert. den., 285 U.S. 543, 52 S.Ct. 393, 76 L.Ed. 935 (1932).

With respect to the Seaboard covers installed on the Mariners, it is conceded that the two linkage bars, each of which actuated the platform arms supporting the cover wheels on one side of the hatch, were not physically interconnected so as to necessarily operate in unison. Characterizing claim 2 as an "apparatus" claim, plaintiff insists that this is beside the point. It contends that the critical inquiry is whether the bars were capable of operation in tandem so that all wheel platforms moved as one. It cites two possibilities for such a synchronous operation.

To prove that the Mariner cover was intended to be raised or lowered as a unit, plaintiff points to a patent issued in 1957 to Mr. George Suderow, now deceased, Seaboard's former chief engineer and the principal designer of the covers furnished for the Mariners. Except for showing a sectional cover that folds away to the sides of a hatch rather than to its ends, the Suderow disclosure is identical to the constructions actually installed on the Mariners. At one point in the specification of that patent, Suderow states that the linkage bars on both sides, or ends, of the hatch may be actuated simultaneously by providing pulling cables of sufficient length to permit joinder of their looped ends at a single cargo hook positioned over the center of the hatch. To have done this on the Mariners would have required pulling cables approximately 56 feet in length, in order not to bind on the sides of the cover when brought together over the center of the hatch—this instead of the 2-foot length actually employed on

---

10. As previously noted, the Farrell cover was never built.

11. 35 U.S.C. § 282.

the Mariners. There is no evidence that any thought was ever given to equipping the Mariners with such over-length pulling cables. To do so would have entailed added expense and constituted a nuisance without offering any increase in operating efficiency.

The other possibility offered by plaintiff for operating the linkage bars together entails the use of normal-length pulling cables in conjunction with a suitable cargo bridle—a length of cable threaded through a block-mounted pulley and having a cargo hook attached to each end. A bridle hook is engaged with the looped end of each pulling cable and an overhead hook from a cargo winch is inserted in the eye provided on the block housing the bridle's pulley. The idea is that when the winch-powered cargo hook is raised over the center of the hatch, both pulling cables, and in turn both linkage bars, will be actuated simultaneously. This procedure is impractical for several reasons. First, a bridle of more than 100 feet in length is required for each large weather deck hatch in order to avoid the same binding problem previously referred to in connection with the use of over-length pulling cables. Second, and far more important, there is the problem of pulling-force components. Unless the overhead cargo boom is precisely positioned on the fore-and-aft center line of the ship, unequal vertical components of force will be exerted on the two legs of the bridle. Should this occur, the necesssary insertion of the stabilizing toggle pin through the hole provided in each of the linkage bars would become an extremely difficult and even hazardous operation.

Theoretical capabilities notwithstanding, the Mariner covers were neither operated to achieve the unitary result disclosed by the claim in suit nor were they intended to so operate. This is best demonstrated by the fact that there was no incentive to do so in preference to the procedures actually employed. The evidence affords no reasonable basis to conclude that any overall time saving or other efficiency would have resulted from raising or lowering both sides of the covers in unison rather than one at a time. Moreover, experience with the Mariners demonstrated that, contrary to the thesis on which Farrell predicated the utility of his jacking mechanism, the entire step of jacking the cover as a preliminary to folding it away at the ends of the hatch was superfluous and completely unnecessary for the protection and preservation of the sealing gasket.

After completion of the weather deck covers for only 12 of the Mariner ships, a fire destroyed Seaboard's rented manufacturing facilities and its engineering plans for the covers as well. The result was that all Seaboard contracts were terminated. These events produced a welter of litigation. Seaboard Machinery Corp. v. Bethlehem Steel Co., 120 F.Supp. 591 (N.D.Fla.1954); Seaboard Machinery Corp. v. Bethlehem Steel Co., 145 F.Supp. 285 (N.D.Fla.1956); Seaboard Machinery Corp. v. Hanover Fire Ins. Co., 149 F.Supp. 362 (N.D.Fla. 1957); United States v. Seaboard Machinery Corp., 256 F.2d 166 (5th Cir. 1958), cert. denied, 358 U.S. 932, 79 S. Ct. 320, 3 L.Ed.2d 304 (1959); United States v. Seaboard Machinery Corp., 270 F.2d 817 (5th Cir. 1959), cert. denied, 362 U.S. 941, 80 S.Ct. 806, 4 L.Ed.2d 770 (1960).

At this juncture Bethlehem Shipbuilding undertook to design and build the weather deck covers for the remaining 23 Mariners. Because all Seaboard plans had been lost in the fire, new plans had to be prepared. It was in the course of drawing up the necessary new plans that Bethlehem's engineers determined to dispense with jacking as a preliminary to the final opening of a cover. The covers that they designed, none of which are accused by plaintiff, are wheel-mounted and made watertight by use of an underside gasket that seats on the coaming ridge. Movable platforms at the ledge openings to raise or lower the cover wheels are completely eliminated. Instead, the length of each wheel opening was reduced to something less than the

diameter of the wheel that it was to receive and one end of the opening was beveled to provide a ramp-like curve. The restricted length of the wheel-opening slots permits the cover wheels to recess only slightly into the plane of the coaming ledge. When each wheel is in its lowermost position in the opening, the cover comes to rest on the coaming ridge. When the cover sections are pulled toward their open position, the several cover wheels climb the curved ramps at the end of the wheel-opening slots and roll onto the upper surface of the coaming ledge. Extensive operating experience has demonstrated that gasket life and performance are not impaired by this type of simplified and faster opening procedure that completely dispensed with the preparatory step that is almost the sole concern of the claim in suit. By eliminating the jacking apparatus initial construction cost was significantly reduced and maintenance problems lessened.

In summary, it is concluded that in at least two respects the Seaboard covers fall without claim 2 of the Farrell patent. First, the covers do not have the practical capacity for simultaneously seating or unseating along both sides of the hatch. Second, and in any event, the mechanical apparatus for raising or lowering the wheels mounted on the Seaboard covers is not the equivalent of the "unitary elevator means" of the claim in suit as it must be defined. It is apparent that in designing the Mariner covers, Seaboard did not appropriate any teaching that had been revealed in prior discussions with Valdemar Farrell.

### The Piezo/Greer Covers

The hydraulically actuated covers embody all of the structural and functional elements that are specifically set forth in the claim in suit, i. e., the coaming with slotted ledges, the cover wheels, and the capability of all sections being seated or unseated at once. The critical question, therefore, becomes whether the interconnected hydraulic rams are the equivalent of the "unitary elevator means" disclosed in claim 2. Put otherwise, do the rams perform substantially the same function in substantially the same way to obtain the same result? Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

Upon consideration it must be concluded that the rams perform their function in a manner entirely different from the Farrell "unitary elevator means." This is most apparent when it is recognized that the rams do no more than replace manually operated screw jacks previously used in removable hatch cover configurations that plaintiff acknowledges are old in the art. From the standpoint of the purchaser, the only real difference between the two types of constructions is the added convenience, at considerably higher cost, of the hydraulically actuated jacking platforms. This was exemplified by the ship owners' refusal to incur the additional initial cost of hydraulic operation for the covers that Seaboard supplied on the Constitution and Independence.

Farrell's "unitary elevator means" performs its elevating function in a manner essentially different from the hydraulic jacks because it was designed to serve not one but two functions having essentially different requirements. The specification, it will be recalled, defines the embodiment of this means as "a continuous belt-like unitary and locking member." Because the means was adapted to two differing aims rather than one, its structural makeup had to be adjusted accordingly and locking capacity necessarily influenced the configuration of the means as a whole. For example, to do its job the means had to function in two planes, vertical for elevating and horizontal for locking.

As equipment completely interchangeable with ordinary screw jacks, the hydraulic system of the Piezo/Greer covers functions only in a vertical plane and bears no structural or design similarity to the Farrell disclosure. The upright rams and the necessary hydraulic fluid

supply lines and pump cannot be said to be the equivalent of "a continuous belt-like unitary elevator * * * member around the hatch coaming." Especially is this so where, as here, the permissible range of equivalents must be narrow. Soundscriber Corp. v. United States, supra.